FILED & JUDGMENT ENTERED
Steven T. Salata

Aug 02 2013

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **JEMSEK CLINIC, P.A.** | ) | **Case No.: 06-31766** |
| | ) | **Chapter 11** |
| _____Debtor._____ | ) | |
| In Re: | ) | |
| | ) | **Case No.: 06-31986** |
| **JOSEPH GREGORY JEMSEK** | ) | **Chapter 11** |
| | ) | |
| _____Debtor._____ | ) | |
| **BLUE CROSS AND BLUE SHIELD** | ) | **Adversary Proc.** |
| **OF NORTH CAROLINA,** | ) | **No.: 07-3006** |
| | ) | **(consolidated with** |
| **Plaintiff,** | ) | **No. 07-03008)** |
| **Counterclaim Defendant** | ) | |
| **Counterclaim Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JEMSEK CLINIC, P.A. AND JOSEPH** | ) | |
| **JEMSEK, M.D. an individual,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| **Counterclaim Plaintiffs** | ) | |
| **Counterclaim Defendants** | ) | |

**MEMORANDUM OPINION DENYING DEFENDANTS' MOTION TO COMPEL**

**THIS MATTER** was before the Court on May 14, 2013 for a hearing on Defendants', Joseph Gregory Jemsek, M.D. ("Jemsek") and the Jemsek Clinic P.A. (collectively, the "Jemsek Defendants") Motion to Compel ("Motion"). Plaintiff Blue Cross and Blue Shield of North Carolina ("BCBSNC") filed a response in opposition to the Motion. Both sides extensively briefed these matters prior to the hearing.

## I. INTRODUCTION

### A. The Jemsek Defendants' Motion

In this latest motion to compel, the Jemsek Defendants accuse BCBSNC of having abused the discovery process in nearly every aspect from the beginning of written discovery through the present. The current motion accuses BCBSNC of having, over the course of this litigation, withheld from the Jemsek Defendants native electronic data, paper attachments, and native or source metadata fields[1] associated with documents responsive to the Jemsek Defendants' discovery requests. According to the Jemsek Defendants, BCBSNC managed this pervasive failure to make discovery by misleading them "into believing that all electronically stored information ("ESI[2]") went into "backup" ESI storage tapes, and that only paper documents and limited emails were available for production." Jemsek Defs.' Br. 2, ECF No. 253. Further, the Jemsek Defendants contend that documents produced by BCBSNC in 2012

_____

[1]"Metadata," "data about data," is electronic evidence that describes the "history, tracking, or management of an electronic document." Although metadata is often lumped into one generic category, there are several distinct types, including substantive (application), system, and embedded metadata. *See Aguilar v. Immigration and Customs Enforcement Div. of U.S. Dept. of Homeland Sec.,* 255 F.R.D. 350, 354-55 (S.D.N.Y. 2008). "Native Metadata" is the metadata that relates to creation of the original electronic document. *Id.* at 353, n.4. "Native format" is the "default format of a file," access to which is "typically provided through the software program on which it was created."

[2] "Electronically Stored Information" has very broad meaning— information that is stored in an electronic medium and is retrievable in perceivable form. *See Aguilar,* 255 F.R.D. at 354. It comprises all current types of computer-based information, encompasses future changes and developments, and may be found in databases that do not correspond to hard copy materials. *Id.*

and 2013 are "unreliable and incomplete," in that certain emails lack attachments and the entire production is so disorganized and BCBSNC's clarifications are so misleading that the "entire discovery effort [is] misleading." *Id*. In the second part of the motion, the Jemsek Defendants move to compel production of documents that they contend were improperly withheld by BCBSNC under claims of work product or attorney-client privilege.

For these alleged failures, the Jemsek Defendants seek an order compelling BCBSNC (1) to reproduce, within ten days, all documents previously produced in this case, in native format, and with all accompanying metadata fields; (2) to pay for a forensic review of this entire discovery reproduction to ensure compliance with the order, and (3) to pay the Jemsek Defendants' fees, costs and expenses occasioned by these failures to make discovery. They also ask this Court for a sixty-day extension of the dates in the current discovery Scheduling Order.

## B. BCBSNC's Response

BCBSNC flatly denies that it misled the Jemsek Defendants in 2007 or caused them to believe that there were no electronic documents available for discovery in this case. It accuses the Jemsek Defendants of now, after the written discovery period has ended, seeking to force it to produce native documents and metadata that were never specified in the Jemsek Defendants' discovery requests, never previously complained about, and never provided in the Jemsek Defendants' own discovery production. BCBSNC asserts that it has repeatedly accommodated the Jemsek Defendants' requests for additional information and technical assistance only to have them use that cooperation against it. Additionally, BCBSNC argues that the burden and expense of completely redoing its prior document production would dramatically outweigh any benefits of this discovery, noting that the Jemsek Defendants have not demonstrated that such native documents or metadata are relevant to the two remaining counterclaims. Lastly, BCBSNC

asserts the Motion should be denied out of hand because many of the challenges raised by this Motion are asserted for the first time herein, and without any prior attempt to meet and confer as required by F.R.C.P. 37(a)(1) and Bankruptcy Rule 7037(a)(1).

Regarding the privileged document issues, BCBSNC (1) again states that many of these assertions were not subject to a "meet and confer" and should be denied; (2) points out that a number of the documents sought to be compelled have already been voluntarily produced and are no longer in contention; (3) argues that others fall within this Court's 2007 "common interest" ruling and are not discoverable; and otherwise (4) contends that the relatively few assertions of work product and attorney-client privilege are well founded.

BCBSNC also asks the Court to award fees and costs under Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure.

## II. FACTUAL BACKGROUND & PROCEDURAL HISTORY

This matter was presented upon generally uncontested facts, mostly documentary evidence gleaned from court records and from correspondence between counsel for the parties. Neither side presented live witness testimony, although several supporting affidavits were presented without objection.

### A.  The Adversary Proceeding

This action began in September 2006 when BCBSNC sued the Jemsek Defendants in North Carolina Superior Court. *Blue Cross and Blue Shield of North Carolina v. Jemsek Clinic, P.A. & Joseph G. Jemsek, M.D.*, No. 06-CVS-18432.  BCBSNC's original claims arise from medical treatments provided by the Jemsek Defendants to BCBSNC members suffering from Lyme disease.  Removed Compl., 9-15, ECF No. 2 (the "Complaint").  BCBSNC asserts that the Jemsek Defendants improperly submitted, and were paid for, hundreds of insurance claims for

these member patients.   The original BCBSNC Complaint sought recovery of all sums previously paid to the Jemsek Defendants and damages under a variety of legal theories: breach of contract, fraud, unfair trade practices, negligent misrepresentation, and other state law claims. Removed Compl., Ex. A, Part 3, ECF No. 2.

Shortly after the Superior Court case was filed, the Jemsek Defendants filed Chapter 11 bankruptcy and removed the state action to this Court.   On January 24, 2007, the Jemsek Defendants filed a joint Answer, as well as nine counterclaims against BCBSNC (the "Counterclaims"). These Counterclaims ranged from breach of contract to tortious interference with a business relationship.   Jemsek Defs.' Ans. and Countercl., ECF No. 5.   As filed, the Counterclaims sought an affirmative recovery from BCBSNC in excess of $20 million.  *Id*. at 28.

Later, and due to the settlement of a MDL case in the Southern District of Florida, most of the Jemsek Defendants' Counterclaims had to be dismissed, with prejudice.   Still later, and due to BCBSNC's failure to apprise either court of the pending "split claims," BCBSNC's primary claims in this action were also dismissed, with prejudice. *See* Order dated Sept. 22, 2010, ECF No. 169.   As such, at this point in this adversary proceeding, only the Jemsek Defendants' Counterclaims of defamation and tortious interference remain.   The Adversary Proceeding has been vociferously litigated and, despite all efforts to move the matter along, the case remains in its discovery phase.

As to this, there have been two basic phases of discovery, separated by the MDL phase of the action. The first discovery phase ran from 2007-2008; the second occurred in 2012-2013. During that initial discovery phase, BCBSNC produced 22,887 pages of documents to the

Jemsek Defendants in paper and TIFF[3] image format. Dawson Aff ¶ 6, ECF No. 260.  The Jemsek Defendants did not specify any other format and did not object to the proffered form of production at any time in 2007 or 2008.  *Id.*

During the latter discovery phase, BCBSNC produced approximately 240,000 more pages of documents in TIFF image format, accompanied by optical character recognition ("OCR") load files (to permit text searching within a document) with some corresponding document metadata (although such metadata was not available for all produced documents).  *Id.* at ¶¶ 7-9.  Again, the Jemsek Defendants did not specify any other format, and did not formally object to the proffered form of production at any time in 2007 or 2008.  *Id.*

The period for written discovery ended on January 21, 2013 and the case appeared ready to move into depositions.  Then, on March 8, 2013, the Jemsek Defendants found a native Excel spreadsheet among the documents produced by BCBSNC from the January 21, 2013 production. That spreadsheet contained several years of financial data concerning the Jemsek Defendants. At this late date, and for the first time ever, the Jemsek Defendants demanded that BCBSNC reproduce all 262,000+ documents previously given, in their "native" format.  Hoping to assuage it opponents, BCBSNC voluntarily provided 418 other spreadsheets in native format.  However, this tender did not satisfy the Jemsek Defendants, and at this point BCBSNC refused their demand to reproduce all documents in such format.  With that, the Jemsek Defendants filed this Motion on April 18, 2013.

### III. DISCUSSION

The Jemsek Defendants accuse BCBSNC of pervasive discovery abuse in this action that warrants requiring BCBSNC to reproduce in native form all 262,000+ written documents

---

[3] Tagged Image File Format (TIFF) is an electronic image of a paper document, which does not contain source metadata.  *Aguilar*, 255 F.R.D. at 353

previously given in discovery, requiring BCBSNC to pay for a forensic review of such production, and assessing it with the Jemsek Defendants' associated costs.  BCBSNC rejects its opponents' assertions as fantasy.  Having already been subjected to very expensive document production in this case, it views this request as a demand for an outrageously expensive fishing trip, with no showing of need, much less legal justification.  Given the history of this case, anything is possible.  However, after a painstaking review of the parties' briefs, affidavits, and underlying documents, this Court concludes that the Jemsek Defendants' Motion is ill founded and should be denied in its entirety.

### A.  The Motion will not be Denied due to any Rule 37(a) Deficiencies.

One issue may be disposed of quickly: BCBSNC's assertion that this Motion should be denied outright due to the lack of a "met and conferred' certification by the Jemsek Defendants. Fed. R. Civ. P. 37 and Bankruptcy Rule 7037(a)(1) require that a motion to compel include a certification that the movant has, in good faith attempted to confer with the party failing to make disclosure or discovery in an effort to obtain it without court action.  The Jemsek Defendants' Motion contains no such certification.  BCBSNC states that the Motion to Compel asserts several "fresh" matters, including the emails allegedly "missing" attachments and the document privilege disputes which have not been the subject of such a meeting.  BCBSNC's Br. in Opp'n to Defs.' Mot. 11-12, ECF No. 263

Frankly, this Motion could be denied for lack of a Rule 37(a)(1) certification without more.  However, denying this Motion based on a missing certification would be a disproportionate penalty and would not advance the case.

Having read in detail the conversations between the two sets of attorneys, it is clear that the spirit of the "meet and confer" rules have been followed even though the alleged production

deficiencies were not always discussed on a document specific level.  Topical problems (e.g.,

withholding communications between BCBSNC and BCBSA under claims of privilege) that

applied to most of these documents, were vigorously debated by the two sides.  The two sides are

simply at an impasse and further discussions would not be fruitful.  Therefore, with a warning to

each side that compliance with the rules of discovery is expected, BCBSNC's procedural

objection is overruled. The motion will be considered on its merits.

**B.  The Jemsek Defendants have Failed to Provide Evidence that BCBSNC Misled them as to the Availability of ESI.**

One of the primary theories behind this Motion is the Jemsek Defendants' contention that

in November 2007, BCBSNC misled them and the Court into believing there were was no ESI

that could be produced in this case.  Having recently seen a "native" Excel spreadsheet produced

by BCBSNC in 2013, the Jemsek Defendants argue that BCBSNC may have willfully concealed

the existence of much other discoverable ESI in this case.

BCBSNC stridently denies this assertion to the point of suggesting that the Jemsek

Defendants should be sanctioned for making it.  The BCBSNC statement cited by the Jemsek

Defendants that it "cannot possibly review" thousands of back up tapes was not addressing ESI,

but whether "BCBSNC has no feasible or practical means of locating" emails potentially deleted

at some point in time which were available only on backup tape.  Even the existence of such

deleted emails was only a possibility.  BCBSNC flatly states that it never represented that those

emails that were otherwise preserved were not available for production.

The Jemsek Defendants have not established credible evidence that would support a

finding that BCBSNC has misled the Jemsek Defendants as to the availability of ESI.

The Jemsek Defendants' production request that sparked this colloquy asked for emails,

not ESI generally; the objection was also limited to the existence of other emails and the

conversation in court was similarly limited.  If the Jemsek Defendants reached a conclusion from this conversation that BCBSNC held no documentation in electronic format, that was an assumption not warranted by the facts or the then present circumstances.

Frankly, it is doubtful that at that point in time, the Jemsek Defendants had such a misimpression.  The Jemsek Defendants' written discovery requests did not ask for native form documents. Nor did the Jemsek Defendants provide the same in their own document production. Nor did they complain about not receiving the same at that point.

Moreover, the 2012 discovery process and discussions between counsel in 2012 should have cleared up any further misunderstandings as to the availability of electronic information. When discovery re-commenced in 2012, BCBSNC produced documents as TIFF images, including Excel spreadsheets, with associated metadata when it was available.  Dawson Aff. ¶¶ 8-9, ECF No. 260.  In May 2012, counsel for the parties repeatedly discussed metadata to aid in the Jemsek Defendants' review of documents previously produced by BCBSNC in written or TIFF form.   In July 2012, counsel for BCBSNC explained in detail BCBSNC's process for preserving electronic information, including company-wide emails. This discussion should have indicated to counsel for the Jemsek Defendants that metadata was available.   Nevertheless, counsel for the Jemsek Defendants did not request such metadata at that time.

While the Jemsek Defendants now contend that the production of the native Excel spreadsheet in early 2013 was their first indication that native documents or source metadata existed, the record suggests otherwise.  With the Jemsek Defendants receiving some metadata production in early 2012, they should have been aware of the availability of such information. The fact that they didn't ask for this format in their discovery requests, nor at the time that these

conversations were occurring, is substantial proof that such information wasn't desired at those points in time.

It is only now, after BCBSNC has undertaken voluminous document production and the discovery "take" is in hand, that the Jemsek Defendants have demanded production in this format. Rather than having been misled, on the record presented, the impression left is that the Jemsek Defendants are simply dissatisfied with the results of their written discovery efforts and wish to cast their net again, further, so as to capture ESI. As discussed below, because the production has already been made and written discovery is over, this request is inappropriate.

### C. Since the Jemsek Defendants Never Requested Documents in Native Format during the Allowed Time Period for Written Discovery, the Jemsek Defendants are not now Entitled to Request Reproduction in such Format.

As described above in greater detail, during the initial discovery phase (2007-2008), both parties produced documents in paper (including TIFF) format. BCBSNC produced some 22,887 documents in paper/TIFF format. Dawson Aff ¶ 6, ECF No. 260. The Jemsek Defendants produced all of their documents in paper format as well. Neither made any demand for ESI/metadata; neither objected to the form of the other side's production.

The same pattern was repeated on a larger scale in the second discovery phase (2012-2013). This time around, BCBSNC produced approximately 240,000 more pages of documents in TIFF image format. The Jemsek Defendants made their production in paper format as well. Neither side made any specification in their discovery requests for native formatting/metadata; neither really objected to the form of the other side's production.

In the second phase, there was some voluntary production of metadata, and at certain points, discussions between counsel about what had or had not been produced. *Id.* at Exs. 7, 9; Hansen Aff, Ex. 8, ECF No. 259. However, because neither side had requested native/metadata

formatting, these discussions were limited in scope (addressed only particular topics and documents) and generally were inconsequential. As to the documents in question, BCBSNC asserted that they had given the Jemsek Defendants everything they had. There were disagreements as to what had been produced, but that is of no moment: the two sides have agreed on very little in this litigation. Accusations and name-calling have been the norm. During these conversations, BCBSNC assured the Jemsek Defendants that they had given them everything they had that was responsive to their requests. While the Jemsek Defendants did not entirely agree, they also did nothing then to require production of documentation in any particular format.

The period for written discovery ended on January 21, 2013. Only then, with the case finally ready to move into its deposition phase, did the Jemsek Defendants 'discover' the existence of metadata in a native Excel spreadsheet produced by BCBSNC.

Then, in March 2013, almost two months after written discovery ended, the Jemsek Defendants began to focus on securing native versions of documents that had previously been produced by BCBSNC. Hansen Aff. ¶ 11. At first, their requests were limited. Counsel for the Jemsek Defendants first asked BCBSNC for native Excel spreadsheets that BCBSNC had previously provided to the Office of Personnel Management ("OPM") and more recently produced to the Jemsek Defendants in TIFF format. They specifically eschewed other ESI. *Id*. BCBSNC questioned the relevance of these spreadsheets to the remaining counterclaims but was willing to accommodate this limited request. BCBSNC provided the 418 Excel spreadsheets in native format. *Id*.

By the time this Motion filed on April 18, 2013, the Jemsek Defendants had expanded their focus to seek, for the first time, comprehensive production of ESI. Now, three months after written discovery ended and four years after their first discovery request, the Jemsek Defendants

demand that BCBSNC resupply them with all 262,000+ previously produced documents, in their "native" or electronic format with all associated metadata.

Under the Federal Rules of Civil Procedure, it is the requesting party's obligation to request ESI in a particular form, or to request specific metadata, if it wants it produced. Fed. R. Civ. P. 34(b)(1)(C). Until now, the Jemsek Defendants have never requested native documents or specific metadata fields, and they have never specified any particular format for the production of ESI. Hansen Aff., ¶ 2.

If a document request does not specify a particular form for production, and in the absence of a court order or agreement between the parties specifying a form for production, a party must produce ESI as it is kept in its usual course of business or in a "reasonably usable form or format." Fed. R. Civ. P. 34(b)(2)(E)(ii); *see also* The Sedona Conference, *The Sedona Principles: Best Practices Recommendations and Principles for Addressing Electronic Document Production* 61 cmt. 12(b), (2nd. ed. 2007). Here, BCBSNC has previously produced its documentation in paper format, including TIFF images.

Use of TIFF images is a "reasonably usable form" for the production of ESI under Rule 34(b)(2)(E) when the parties have never discussed a particular format for production of electronic documents. *See Wyeth v. Impax Labs., Inc.*, No. Civ. A. 06-222-JJF, 2006 WL 3091331, at *1-2 (D. Del. Oct. 26, 2006); *Ponca Tribe of Indians v. Cont'l Carbon Co.,* No. CIV-05-445-C, 2006 WL 2927878, at *2 (W.D. Okla. Oct. 11, 2006) (denying motion to compel production of native documents when plaintiffs did not request that electronic documents be produced in any particular format).

Of course, the Jemsek Defendants are now requesting a more particularized format, but it is simply too late to do so. As the District Court for the Southern District of New York observed

in its seminal opinion on these issues, "if a party wants metadata, it should 'Ask for it. Up front.

Otherwise, if the party asks too late or has already received the document in another form, it may

be out of luck.'" *Aguilar v. Immigration & Customs Enforcement Div.*, 255 F.R.D. 350, 357

(S.D.N.Y. 2008) (*citing* Adam J. Levitt & Scott J. Farrell, *Taming the Metadata Beast*, N.Y.L.J.,

May 16, 2008) (internal alterations omitted); *see also Autotech Techs. Ltd. P'Ship v.*

*Automationdirect.com, Inc.,* 248 F.R.D. 556, 560 (N.D. Ill. 2008) (concluding that the defendant

"was the master of its production requests; it must be satisfied with what it asked for"). Courts

frequently deny requests for native documents and metadata made for the first time at the end of

document discovery or after a party has produced a significant number of documents. *See*

*Autotech Techs. Ltd,* 248 F.R.D. at 559-60 (denying motion to compel metadata that was not

included in initial request); *D'Onofrio v. SFX Sports Grp., Inc.*, 247 F.R.D. 43, 48 (D.D.C. 2008)

(same); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. MD 05-

1720(JG)(JO), 2007 WL 121426, at *4 (E.D.N.Y. Jan. 12, 2007) (denying defendant's motion to

compel plaintiffs to re-produce in a more searchable form data they had already produced, where

plaintiffs had "provided a significant amount of discovery, in several installments, in the form

they prefer, and heard no objections for several months").

We are now beyond the end of written discovery. BCBSNC has already produced an

inordinate amount of documentation in the case. It would be unreasonable to require it to

reproduce that documentation at this late date, particularly since the Jemsek Defendants have

failed to demonstrate the relevance of the sought ESI to the remaining issues in this case.

### D. Producing Additional Native Files and Metadata is not Proportional under Rule 26.

Even if the Jemsek Defendants' requests for native documents and metadata had been

timely, its requests are not proportional under Fed. R. Civ. P. 26(b)(2)(C)(iii). A party need not

produce documents if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii).

Here, the Jemsek Defendants have requested re-production of 262,000+ pages and "all" metadata, even though the only remaining claims are for defamation and tortious interference with business relationship. The Jemsek Defendants demand reproduction of everything previously produced in the action. Much of the first phase of discovery related to claims and defenses which have since been dismissed. Similarly, BCBSNC has already voluntarily provided some ESI (e.g., the 418 spreadsheets). A party is not required to produce the same ESI more than once. Fed. R. Civ. P. 34(b)(2)(E)(iii). As the Jemsek Defendants have made no effort to demonstrate the relevance of native documents or metadata to those claims, re-producing them is unduly burdensome.

The Jemsek Defendants also ignore that there are three general categories or types of metadata, two of which are rarely discoverable. Substantive or application metadata is embedded in the document and reflects substantive changes made by the user. *See Aguilar*, 255 F.R.D. at 354. Where available, substantive metadata may be useful to show prior editorial comments and information about fonts, spacing, etc. in the document. *Sedona Principles*, *supra*, cmt. 12a. For example, this type of metadata will show how many words or characters are in a particular document. Dawsen Aff. ¶ 12. While relevant is some cases, the requesting party must show good cause to obtain production of substantive metadata. *Aguilar*, 255 F.R.D. at 354. Similarly, system metadata is information created by the user or by an information technology system, such as author, date/time of creation, and date modified. *Id.* Most courts have

concluded that system and substantive metadata lack evidentiary value because they are rarely relevant to the merits of a parties' claim. *See id.* (collecting cases). In contrast, embedded metadata is not typically visible to a user but may be necessary to understand the document, such as Excel spreadsheet formulae or hyperlinks. *Id.* at 354-55. This type of metadata is generally discoverable. *Id.* at 355. (e.g., the native versions of Excel spreadsheets).

The Jemsek Defendants request all three types of metadata, but make no attempt to show how information would lead to the discovery of admissible evidence. Based on this Court's knowledge of the dispute, it would not appear to be relevant. As the Jemsek Defendants' counsel has previously acknowledged, their remaining counterclaims are about BCBSNC's communications with third parties regarding the Defendants. *See*, e.g., Hansen Aff., Exs. 5-6, (letters from the Jemsek Defendants' counsel). There are no framed issues in this case about who authored a particular document, when documents were last edited, or any other issues that metadata (of any form) is likely to be useful in resolving.

Significantly, the Jemsek Defendants do not contend that additional metadata would help them understand any specific documents. They merely demand that BCBSNC reproduce all documents, many of which were produced before the scope of discovery was narrowed. BCBSNC suspects that their demand is not intended to gain information likely to advance the Jemsek Defendants' remaining claims, but is simply an effort to drive up the cost of defending the case.

Perhaps this is an effort to obtain settlement leverage. Even if it is not, the request is simply too attenuated to be allowed, particularly given its cost. *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. 05-138-WOB, 2006 WL 5097354, at *8 (E.D. Ky. Dec. 18, 2006) (denying a blanket motion to compel production of metadata).

To comply with the Jemsek Defendants' demand, BCBSNC would not merely have to reproduce documents, it would have to conduct an entirely new collection of the native files and other available types of metadata. Dawson Aff. ¶ 12.  In other words, it would have to re-conduct the entire 2012-2013 collection and production process from scratch.  This would be grossly expensive and entirely inappropriate.

In short, BCBSNC's document productions in this case have complied with the requirements of Rule 34.  Its prior production need not be redone.

### E. The Jemsek Defendants have Failed to Provide Evidence that BCBSNC Failed to Produce Substantive Attachments to Emails.

A second theory behind this Motion is the Jemsek Defendants' assertion that BCBSNC has failed to link its production attachments to parent files and has failed to include attachments to produced documents in such a fashion that the prior document production is unusable.  After realizing that it had received an Excel spreadsheet in native formatting, the Jemsek Defendants hired Huron Consulting Group ("Huron") to evaluate that document. Huron was also asked to evaluate approximately a limited number of emails produced by BCBSNC to determine whether all of the relevant attachments were produced with the parent documents.

Based upon Huron's limited review, the Jemsek Defendants have identified 100 emails which they contend are missing attachments.  From this limited sample, the Jemsek Defendants then posit that it is impossible to identify attachments throughout BCBSNC's document productions.  From this, they reach the bold conclusion that the entire production is useless. They would have BCBSNC start all over and reproduce all 262,000+ documents.  Further, they would have BCBSNC pay for a forensic expert to ensure that it is done right.

BCBSNC's frustration with this assertion is obvious: the Jemsek Defendants' conclusions are simply wrong.  These contentions are not just misguided, but could have been demonstrated

without court intervention, had the Jemsek Defendants identified specific documents which they believed to be deficient in a "meet and confer," before filing this Motion.  BCBSNC sees this assertion as an attempt by its opponents to gain an unfair tactical advantage.

In each respect, save for the motivation of the Jemsek Defendants in making the assertion (as to which the evidence is inconclusive), BCBSNC has the better end of the argument.

Based on what has been presented, it appears that the asserted deficiencies are illusory. In its written submissions, BCBSNC made a painstaking review of the 100 allegedly defective emails.  The results are charted in an exhibit to Ms. Dawson's affidavit.  Dawson Aff., Ex. 6, ECF No. 260.  As that document reflects, a majority of the emails produced include:  "Production BegAttach" and "Production EndAttach" metadata that identifies by Bates number the emails' attachments.  *Id.* at ¶¶ 10-11.

In twenty-two instances in the Jemsek Defendants' "sample," attachments were produced in a different production than the parent emails, such as when an attachment was initially withheld as work-product or privilege but later produced.  *Id.* at ¶ 14(a).  When this occurred, the metadata did not link the email and attachment.  However, BCBSNC has identified these attachments in the chart attached to Ms. Dawson's affidavit.  Dawson Aff., Ex. 6.

Several attachments were not produced because they continue to be withheld as privileged or as work-product.  *Id.* at ¶ 14(b).  Producing these attachments along with their parent emails would have required redacting in full every attachment and producing blank or black pages in discovery, a needlessly time-consuming and costly process.  BCBSNC's reasoning for withholding attachments on privilege or work product grounds was previously explained to Jemsek.  *See* Dawson Aff., Ex. 7. at 3-4.

In the end, most of the "missing" attachments about which the Jemsek Defendants complain, were not produced simply because the Jemsek Defendants' counsel did not want non-responsive documents.  These deleted documents are either redundant text-only copies of emails (which were duplicative of the emails they were attached to), fifteen junk documents (such as employee V-cards, or program icons), or patient medical records that the Jemsek Defendants' counsel specifically stated he was "not interested in… at all."  Dawson Aff. ¶ 14(c)(i-ii); Hansen Aff. ¶ 4, Ex. 7, ECF No. 259.  It would appear that the Jemsek Defendants are attempting to sanction BCBSNC for acceding to their own requests about the discovery production.

Further, during the written discovery period, the Jemsek Defendants did not raise any questions about alleged missing attachments from emails.[4]  Just as their missing metadata contention, this appears to be a complaint raised needlessly late.  Although they had been receiving documents, including emails, from BCBSNC since 2007, they appear not to have focused on the attachments until after written discovery concluded.  Again, this leaves the impression that the missing attachment assertion is but an effort to get a  "do over" of written discovery so that the Jemsek Defendants can seek additional information.

In short, the evidentiary record is inadequate to support the hyperbolic conclusions of pervasive discovery abuse that the Jemsek Defendants would have this Court adopt.  Given the very large number of documents produced in this case, it is conceivable that a few attachments may have been divorced from their parent documents.  However, most are accounted for and it does not appear that there is any widespread disassociation of emails and attachments.  The evidence does not suggest that the production was unusable.  The evidence is entirely insufficient

---

[4] The Jemsek Defendants did not retain Huron until after March 25, 2013, which was two months after the written discovery period ended.

to support a finding that BCBSNC has intentionally, improperly withheld, or separated, substantive attachments from the parent documents.

**F. The Jemsek Defendants are not Entitled to any Documents Contained within BCBSNC's Privilege Log.**

The Jemsek Defendants request the Court order BCBSNC to produce documents associated with 165 entries on BCBSNC's 2012-2013 privilege log.[5]  These entries are all documents that BCBSNC asserts are: (1) privileged exchanges between BCBSNC and BCBSA protected under the common interest rule; (2) created by BCBSNC in anticipation of litigation and protected as work product; or (3) reflect legal advice given by BCBSNC attorneys and protected as attorney-client privilege.  This Court finds that BCBSNC properly withheld from discovery the outstanding 165 documents associated with the remaining privilege log entries.

**1.    The Direct Communications between BCBSNC and BCBSA are Protected under the "Common Interest Rule."**

The Jemsek Defendants seek production of communications between BCBSNC and BCBSA that BCBSNC withheld under the "common interest privilege."  BCBSNC asserts that this common interest stems from its contract with BCBSA to administer in North Carolina the Blue Cross Blue Shield Service Benefit Plan ("SBP"), which is one health care benefit option available in the national Federal Employee Health Benefit Plan ("FEHBP").  The Jemsek Defendants argue that this contract does not create a common interest privilege because there is

---

[5] This Court need not address 232 of the 397 entries identified in the Jemsek Defendants' Motion.  These entries were either already produced prior to the Motion or upon further review do not contain any privileged material and have been produced subsequently by BCBSNC.

no indication that BCBSNC and BCBSA cooperated in formulating a common legal strategy for the Jemsek litigation.

The common interest rule, also known as the joint defense privilege, extends the attorney-client privilege to parties who share a common interest in litigation. "For the privilege to apply, the proponent must establish that the parties had 'some common interest about a legal matter.'" *In re Grand Jury Subpoena Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005). The purpose of this rule is to allow parties with a common interest to "communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *Id.*

To be protected under the common interest privilege, BCBSNC must "demonstrate that the communicating parties shared an identical legal interest, the communication was made in the course of and in furtherance of the joint legal effort, and the privilege had not been waived." *Neighbors Law Firm, P.C. v. Highland Capital Mgmt., L.P.,* 5:09-CV-352-F, 2011 WL 761480, at *3 (E.D.N.C. Feb. 24, 2011) (quotations omitted). BCBSNC must also demonstrate that the communications are in fact privileged, as the common interest rule does not provide "an independent source of privilege or confidentiality." *Sokol v. Wyeth*, No. 07 Civ. 8442 (SHS)(KNF), 2008 WL 3166662, at *5 (S.D.N.Y. 2008). BCBSNC has demonstrated what is necessary for the privilege to apply.

First, BCBSNC and BCBSA share an identical legal interest that stems from BCBSNC's contract with BCBSA to administer the SBP in North Carolina. *See* Lynn Page Ross Aff. ¶ 4, ECF No. 257; Kat Gesh-Wilson Aff. ¶ 3, ECF No. 258. Nationally, the FEHBP is administered by the United States Office of Personnel Management ("OPM"). Ross Aff. ¶ 4; Gesh-Wilson Aff. ¶ 4.

BCBSA entered into a contract with OPM to provide to federal employees the SBP. Gesh-Wilson Aff. ¶ 4.  In turn, BCBSA entered into a contract with BCBSNC to administer the BCBSA SBP in North Carolina.  *Id.*  Licensees such as BCBSNC are responsible for processing claims and providing customer service to SBP members within their regions.

Within BCBSNC, the Federal Employee Program Operations and Health Management Department ("FEP") is responsible for administering the SBP in North Carolina.  *Id.* at ¶ 5.  If a federal employee is enrolled in the BCBSA SBP and visits a participating doctor in North Carolina, the doctor submits its claim for payment to BCBSNC.  *Id.* at ¶ 6.  BCBSNC prices the claim in accordance with the terms of the provider's contract with BCBSNC and then sends the claim to the FEP Operations Center (subcontractor to BCBSA) in Washington, D.C.  The FEP Operations Center then sends the claim back to FEP at BCBSNC.  At that point in time, BCBSNC does one of two things: (1) BCBSNC pays the doctor what is owed or (2) BCBSNC resolves any edit placed on the claim by either BCBSNC or the BCBSA Operations Center and sends the claim back to the Operations Center for continued processing until the claim can be paid or denied.  *Id.*

BCBSNC, on a regular basis, requests reimbursement from OPM, which reimburses BCBSNC for the claims expense.  *Id.* at ¶ 8.  BCBSNC, as the entity which initially processes all FEHBP claims in North Carolina, is therefore responsible, in conjunction with the FEP Operations Center, for determining which claims OPM ultimately will pay.  *Id.* at ¶ 7.

Due to their relationship, BCBSNC is required to coordinate with BCBSA regarding appeals by members with respect to benefit determinations.  *Id.* at ¶ 8.  BCBSNC is also required to litigate, on behalf of BCBSA and OPM, any disputes regarding the SBP.  *See* Hansen Aff. 48-52, Ex. 22, ECF No. 259. (2006 FEP Administrative Procedures Manual).  If BCBSNC

mistakenly pays any improper claims or simply overpays any claims under the SBP, BCBSNC has a duty to seek reimbursement for those payments on behalf of both it and BCBSA (and ultimately on behalf of OPM). Gesh-Wilson Aff. ¶ 9.

BCBSNC initially filed this lawsuit based on overpayments and improper payments to the Jemsek Defendants from all plans and groups administered by BCBSNC, which included payments made under the SBP that were reimbursed by BCBSA and OPM. Ross Aff. ¶ 4. As a result, BCBSNC coordinated with BCBSA and OPM with regard to the lawsuit, where claims made to the SBP are at issue. Any recovery by BCBSNC of overpayments or improper payments would then be returned to OPM through BCBSA.

BCBSNC's and BCBSA's common interest is also reflected in various OPM records. For example, OPM specifically requested that BCBSNC "[i]nclude all FEP member claims in your civil case as you normally would to protect the program." Hansen Aff., Ex. 23, ECF No. 259 (1/16/07 Email from Agent VanVarick to L. Patalano). Also, OPM kept case notes on BCBSNC's progress in its action against Jemsek, in which it indicated "BCBSNC is proceeding with a civil action for which FEHBP losses are included." *See* Hansen Aff., Ex. 24 at 4 (OPM Records Obtained from the Jemsek Defendants' Subpoena of OPM).

Based on the relationship described above and the parties' coordination regarding this lawsuit, BCBSNC and BCBSA clearly had a "common legal interest" in this litigation. *See LaSalle Bank Nat. Ass'n v. Lehman Bros. Holdings, Inc.*, 209 F.R.D. 112, 116 (D. Md. 2002) (finding a bank and a mortgage loan service company had a common legal interest in claims resulting from defaulted loans which the mortgage loan service company managed on behalf of the bank).

The Jemsek Defendants argue that privilege shouldn't apply because documents

produced in discovery show that BCBSNC and BCBSA did not share an identical legal interest. The Jemsek Defendants point to a letter from BCBSNC to BCBSA's chairman, Steve Martin, which demonstrates that BCBSNC and BCBSA had completely differing views on how to handle claims submitted by some of Dr. Jemsek's patients that were part of the Federal Health Employee Program.  May 23, 2007 letter from Lou Patalano to Steve Martin, Defs.' Rep. Br. in Supp. of Mot. to Compel, Ex. Y., ECF No. 267.

However, sharing an identical legal interest does not mean that the parties have to agree 100% on legal strategy.  When two parties with a joint legal interest discuss their joint legal strategy, it is reasonable to assume that there will be some disagreements.  Isolated disagreements over how to handle claims are not detrimental to the common interest privilege.

Second, the withheld communications were made in the furtherance of their joint legal effort.  This Court has conducted an *in camera* review of the BCBSNC privilege log and from that review concludes that these documents were made in the course of and in furtherance of a common legal interest.  These documents stem from BCBSNC's duty to seek reimbursement for overpayments or improper payments for medical services provided to SBP participants.  They include:

(1) communications between counsel for BCBSNC and counsel for BCBSA regarding processing several individuals' claims under the SBP and how those payments might affect the litigation with Jemsek, including drafts of letters regarding these claims;

(2) communications between counsel for BCBSNC and counsel for BCBSA regarding the investigation into overpayments and improper payments made to Jemsek; and

(3) communications between counsel for BCBSNC and counsel for BCBSA regarding the progress and strategy of the lawsuit with Jemsek.

All of these documents were made in furtherance of their common legal interest.

Third, the traditional requisites for the attorney-client privilege or work product protection doctrine are present. As discussed above, the common interest rule does not create an independent source of privilege or confidentiality." *Sokol*, 2008 WL 3166662, at *5. "In order to claim the protection of the common interest doctrine, [BCBSNC] must first demonstrate that the communications at issue are in fact privileged." *Mainstreet Coal. v. Kirkland's Inc.,* 270 F.R.D. 238, 243 (E.D.N.C. 2010).

In 2007, this Court held that BCBSNC was only required to produce documents "created prior to July 1, 2006," as documents created on or after that date were properly withheld as work product. Order Granting in Part, Den. in Part, and Holding in Abeyance in Part Defs.' Mot. to Compel, ECF No. 61. Here, all documents between BCBSNC and BCBSA sought by the Jemsek Defendants were created after July 1, 2006 and thus fall under the attorney-client privilege or work product protection. *See* Pl.'s Privilege Log 1-55, ECF No. 48.

Finally, BCBSNC has not waived the common interest privilege.

Because BCBSNC has demonstrated that it and BCBSA share an identical legal interest, that the communications withheld were made in the course of and in furtherance of the joint legal effort, and that the privilege has not been waived, the Jemsek Defendants are not entitled to production of these documents.

### 2.   The Jemsek Defendants are not Entitled to Production of Documents Marked "in Anticipation of Litigation."

The Jemsek Defendants seek production of documents that BCBSNC has marked as "prepared in anticipation of litigation" on the grounds that the documents were not created by an attorney or by someone else at the direction of BCBSNC's attorney. The Jemsek Defendants claim that these are non-privileged documents that were created in the ordinary course of business of BCBSNC and reflect the performance of the necessary day-to-day business functions

24

of investigating and paying insurance claims that health care providers routinely submit to BCBSNC for reimbursement.  BCBSNC disagrees, and so does this Court.

Fed. R. Civ. P. 26(b)(3), which codifies the work product doctrine, provides that, "a party may not discover documents … prepared in anticipation of litigation … by or for another party or its representative."  Fed. R. Civ. P. 26(b)(3)(A).  BCBSNC bears the burden of proving the work product doctrine applies. *Suggs v. Whitaker*, 152 F.R.D. 501, 505 (M.D.N.C. 1993).  To claim that work-product protection, BCBSNC must show: (1) the entries are documents or other tangible things, (2) which BCBSNC prepared in anticipation of litigation, and (3) they were prepared by or for a representative of BCBSNC.  *Id.*

This Court addressed this same issue back in 2007 in another discovery dispute between these parties. As we indicated then, it is within the ordinary course of business of an insurance company to investigate and evaluate claims made by its insureds.  Even so, documents placed in the insurer's claims files *after* the insurance company makes a decision whether to pay or not pay the claim are entitled to work product protection.  On that occasion, this Court held that on or after July 1, 2006, BCBSNC could be said to be working in anticipation of the litigation that it would file three months later.  Thus, the documents at issue then, which were created on or after July 1, 2006 could be properly withheld as work product.

In the present instance, this Court has again reviewed the privilege log and finds that all of the documents created by BCBSNC after July 1, 2006, were created in anticipation of litigation.  These documents include: (1) notes and impressions from an interview with a former Jemsek patient who provided information regarding the lawsuit with Jemsek; (2) notes and impressions from a meeting with government officials regarding the lawsuit with and (3) legal analysis of BCBSNC's contract with Jemsek.  Each of these documents was prepared by either a

25

BCBSNC attorney or representative and not in the normal course of business.  Therefore, all of these privilege log entries were properly withheld as work product.

   **3.    The Jemsek Defendants are not Entitled to Production of Internal Documents
   BCBSNC withheld on Attorney-client Privilege.**

Finally, the Jemsek Defendants make a cursory one-sentence argument that BCBSNC improperly withheld documents which are not protected by attorney-client privilege.

The attorney-client privilege protects communications between a lawyer and a client on issues relating to legal representation.  *Reid-Lamb v. Time Warner Entm't Co.*, No. 3:10-CV-77-FDW-DCK, 2010 WL 5128632, at *1 (W.D.N.C. Dec. 10, 2010).   The privilege applies to communications between a corporate party and its in-house counsel.  *Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981).  It also includes fact finding or investigation done by an attorney in the context of insurance claims when the work is related to the rendition of legal services. *Conn. Indem. Co. v. Carrier Haulers, Inc.,* 197 F.R.D. 564, 572 (W.D.N.C. 2000).

The Jemsek Defendants claim these current documents are not protected by the attorney client privilege because they were transmitted between non-attorneys.   However, documents containing discussions of legal advice given by an attorney are protected as attorney-client privileged, irrespective of whether they were sent, received, or prepared by an attorney.  *See Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 543 (E.D.N.C. 1993) ("documents subject to the privilege may be transmitted between non-attorneys (especially individuals involved in corporate decision-making) so that the corporation may be properly informed of legal advice and act appropriately.").

This Court has reviewed each of these documents and concludes that they meet the applicable criteria, are privileged, and were correctly withheld from discovery.  The documents associated with the privilege log entries include: (1) summaries of the litigation with the Jemsek

Defendants which reflect legal strategy and advice; (2) communications between BCBSNC employees about the Jemsek litigation which reflect legal advice; (3) work product developed by BCBSNC employees in furtherance of the litigation with the Jemsek Defendants; and (4) communications between counsel for BCBSNC and BCBSA regarding the Jemsek litigation. Furthermore, all of the documents sought by the Jemsek Defendants were created after July 1, 2006.

## IV. CONCLUSION

The Jemsek Defendants' assertion that BCBSNC misled them in 2007 into believing that it possessed no ESI is fanciful and errant. Their interest in ESI and metadata is only recently developed; the conversations they point to relate only to potentially deleted emails that were not otherwise preserved and whether they could be located on backup tapes.

In requesting the reproduction of all 262,000+ documents that have thus far been produced by BCBSNC in the course of discovery, the Jemsek Defendants have asked for discovery after the period expired that could have, and should have, been requested in their initial requests. They essentially ask this Court to save them from their own prior decisions. Even if this were not so, there has been no showing that reproduction of documents and accompanying metadata would be likely to contain sufficiently meaningful information pertaining to their two remaining counterclaims to justify the gross expenditure of time and money that would be required on the part of BCBSNC. This is essentially a proposal to undertake an eleventh hour fishing expedition in hopes to netting something more to support their theories. Finally, BCBSNC has properly withheld the enumerated documents in its privilege log under its claims of work product and/or attorney-client privilege.

**Accordingly,** the Jemsek Defendants' Motion to Compel is **DENIED**.  The parties shall bear their own costs and attorneys fees.


**SO ORDERED.**

**This Order has been signed electronically.   United States Bankruptcy Court
The Judge's signature and Court's seal
appear at the top of the Order.**